UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| RHODE ISLAND COMMISSION FOR HUMAN RIGHTS, Plaintiff, | ) ) ) ) ) | |
| v. | ) ) | C.A. No. 13-445-M-LDA |
| NOREEN D. GRAUL, et al., Defendants | ) ) ) ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Judge

On February 1, 2012, Mardea Caulcrick-Grimes and Ernest Grimes became the proud parents of Janjay Grimes, their first child. Whatever the other consequences of the happy event, and there no doubt were many, the birth of Janjay caused the owner of Briarwood Meadows (the apartment complex in Warwick where the family lived) to serve notice that the family would have to either move from their one-bedroom apartment into a two-bedroom unit or leave the complex altogether. The March 12, 2012, letter, sent by limited partner Defendant Noreen D. Graul, advised that the occupancy limits precluded more than two persons in a one-bedroom apartment. The letter gave the family a six-month grace period *if* they paid a premium rental fee. If they neither moved to a two-bedroom unit nor paid a premium for a delayed move, they faced eviction once their lease expired in April. (ECF No. 56-7).

Briarwood Meadows Limited Partnership (hereafter "Briarwood") relied on an interpretation of Rhode Island's residential occupancy code to assert a "two heads per bedroom" policy (ECF No. 57 at 18); it maintained that the code required at least seventy (70) square feet

1

of bedroom space for the first occupant plus at least fifty (50) square feet for each additional occupant (including a baby), for a total of 170 square feet in a bedroom in which three people slept.   It is undisputed that the Grimeses' bedroom measured at least 150 square feet.[1] Briarwood contends that no other room in the apartment could be used as a bedroom because no other room conformed to code requirements for a sleeping area.[2]

The Grimeses filed a complaint with the Rhode Island Commission for Human Rights, alleging under both federal and state fair housing laws that they were being discriminated against on account of their "familial status."  The Commission agreed and brought this lawsuit on behalf of them and Allison Cote, a tester who attempted unsuccessfully to rent a one-bedroom apartment for her "pretend" three-person family.[3]  The case is before the Court on the Plaintiffs' Motion for Partial Summary Judgment, limited to liability, and the Defendants' Motion for Summary Judgment.  (ECF Nos. 40 and 56).

For reasons explicated below, not the least of which is that the applicable state building code now and at that time demanded only 150 square feet of bedroom space for three occupants, the Court finds that there are no genuine issues of material fact, that the occupancy policy of the

---

[1] The Briarwood brochure publicizes measurements of 11' x 14', for a total of 150 square feet. (ECF No. 9-3).   Paul Driscoll, president of the corporation that owned Briarwood, filed an affidavit asserting that the Grimeses' unit was actually 150.21 sq. ft.  (ECF No. 56-1 at ¶9), while Noreen Graul's affidavit cited the bedroom space according to the building's design plans as 154 square feet.  (ECF No. 61-17 at ¶6).   The difference is irrelevant, for the reasons that follow: so long as the bedroom was at least 150 sq. ft. it could legally sleep three (3) persons under the State Building Code. *See infra* at p. 24.

[2] An apparently standard apartment of 700 square feet in total, the unit consisted of a combined living/dining space open to a kitchen area, a bathroom, and a single bedroom.  (ECF No. 9-3).

[3] The Commission claims jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3612(o) for this Court to hear a claim brought under Title VIII of the Civil Rights Act of 1968, §§42 U.S.C. 3601 *et seq.* (the federal Fair Housing Act).   Jurisdiction to hear the claim that the same actions violated the Rhode Island Fair Housing Practices Act, R.I.G.L. §§ 34-37-1 *et seq.* is supplemental pursuant to 28 U.S.C. § 1367(a).

Defendants had an adverse discriminatory and disparate impact upon the Grimeses because of their familial status, and that the Plaintiffs are therefore entitled to summary judgment as to liability on both federal and state law grounds.

## I.

### Housing Discrimination

The federal Fair Housing Act ("FHA") was passed as part of the comprehensive Civil Rights Act of 1968 in a multi-pronged response to "a period of considerable social unrest; ..." *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* ___ U.S. ___, 135 S.Ct. 2507, 2516 (2015) (hereafter, *"Inclusive Communities"*).  Focusing in particular on "residential segregation and unequal housing and economic conditions in the inner cities as significant, underlying causes of the social unrest," the Kerner Commission[4] recommended, and Congress passed, "a comprehensive and enforceable open-occupancy law, making it an offense to discriminate in the sale or rental of any housing ... on the basis of race, color, religion or national origin." *Inclusive Communities, supra.*[5]

Twenty years later, Congress amended the Act to include "familial status" as a prohibited category of discrimination, based in part on two HUD-sponsored studies that found policies prohibiting children were used as a pretext to discriminate on the basis of race.[6]  "Familial

---

[4] Formally, the National Advisory Commission on Civil Disorders, established by President Lyndon Johnson by Exec. Order No. 11365, 3 CFR 675 (1966-1970 Comp). *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, supra* at 2516.

[5] The Rhode Island Fair Housing Practices Act prohibits discrimination on the basis of sexual orientation, gender identity or expression, marital status, previous victimization of domestic abuse, or age. R.I.G.L. §§ 34-37-2, 34-37-2.1.

[6] Tim Iglesias, *Moving Beyond Two-Person-Per-Bedroom: Revitalizing Application of the Federal Fair Housing Act to Private Residential Occupancy Standards*, 28 Ga. St. U. L. Rev. 619, 628 (2012).  At the same time, the Act was broadened to prohibit discrimination in housing because of physical or mental disabilities. Schill and Friedman, *"The Fair Housing Amendments*

status" is defined as a household with one or more people under the age of eighteen (18) living

with a parent or guardian. 42 U.S.C. § 3602(k). In a bi-partisan effort, Congress "carefully

crafted" this amendment to protect "single-parent families, young families with children, and

poor families…without placing an undue burden on owners and landlords." Tim Iglesias,

*Moving Beyond Two-Person-Per-Bedroom: Revitalizing Application of the Federal Fair*

*Housing Act to Private Residential Occupancy Standards*, 28 Ga. St. U. L. Rev. 619, 628-629

(2012). In support of the Senate's revised bill, which explicitly extended coverage to pregnant

women and families seeking to adopt minors, U.S. Representative Don Edwards (D-CA), then

Chairman of the House Civil and Constitutional Rights Subcommittee, stated:

> There are few experiences more humiliating, more cruel, than to be
> denied housing because of your race, religion, sex, handicap, or
> because you have children. Discrimination in housing, perhaps
> more so than in any other area, continues to be pervasive in our
> country. It divides us into hostile camps. It encourages racial
> tensions, crime, and disillusionment. The House is now called
> upon to give final approval to another essential law, a statute that
> can bring hope and some comfort to men, women, and children
> who need and deserve our help.

134 Cong. Rec. H6491-02, 1988 WL 185128.

---

*Act of 1988: The First Decade," http://www.huduser.org/portal/ Periodicals/ CITYSCPE/*
*VOL4NUM3/ schill.pdf* at *3. Gender had become a prohibited category in 1974. *Id.* at *20, n.1.
At the time of publication of this article, complaints based on familial status and disability had
outnumbered all other categories of discrimination but race. *Id.* at *9. "Throughout virtually the
entire period 1989-97, familial-status complaints had the highest likelihood of being closed with
a [HUD or FHAP] reasonable cause finding." *Id.* Indeed, the authors report a finding of
reasonable cause in 6.5% of the total familial-status complaints between 1989 and 1997
compared to 2.3% of race-based complaints and 2.3% of disability-based complaints. "Thus in
both proportionate and absolute terms, familial-status cases would dominate the caseload of the
administrative law judges who would hear fair housing complaints as well as that of the courts."
*Id.*

The 1988 amendment inserting "familial status" was impelled not only by the widespread restrictions on children in rental units,[7] but by the increasing crisis of family homelessness and the belief that all Americans are entitled to the "basic human right" of decent, affordable, and stable housing.[8]   In a simultaneous effort to eradicate homelessness, the U.S. House of Representatives introduced, and Congress eventually passed, the Omnibus McKinney Homeless Assistance Act of 1988.   At a hearing in August 1988, Representative Nancy Pelosi (D-CA), then a member of the Housing Subcommittee, stated: "More people are homeless today in America than at any time since the Great Depression.   Overall, the homeless population grew by 25 percent in 1987 alone. Families with children are now the fastest growing group among the homeless. In the richest Nation on earth, growing numbers of men, women, and children are living on the streets and eating out of garbage cans."   134 Cong. Rec. H6196-01, 1988 WL 174641.   "When families are unable to obtain rental housing, 63% resort to living with relatives or friends and 33% end up living in cars, vans, abandoned buildings, or tents." Bilott, *The Fair Housing Amendments Act of 1988:   A Promising First Step Toward the Elimination of Familial*

---

[7] Restrictions on children in rental units were common.   A national survey conducted by the Department of Housing and Urban Development (HUD) "showed 25% of all rental units were unavailable at all to families with children and another 50 percent of the rental units were available to families with children, with some restrictions. … Therefore, 75 percent of all rental units had at least some restrictions on children, and the trend is toward increasing discrimination."   Frooman, *Statutory Analysis of the Familial Status Provision of the Fair Housing Amendments Act of 1988—Or, 'Why Do I Have to Live With Those Curtain-Climbing Rug Rats?'* 17 N.Ky.L.Rev. 215, 216 (notes omitted).   *See*, Bilott, *The Fair Housing Amendments Act of 1988:   A Promising First Step Toward the Elimination of Familial Homelessness?* 50 Ohio St.L.J. 1275, 1278 (1989), citing the 1980 HUD survey, and noting that a similar survey in 1974 found only 17% of rental units excluding children.

[8] In February 1989, U.S. Senator Alfonse D'Amato (R-NY), a cosponsor of the Fair Housing Amendments Act of 1988, supported a joint-resolution to designate April 1989 as "Fair Housing Month."   Sen. D'Amato stated that housing is a basic human right and sought to remind the country not to lose sight of the American values of fairness and equality.   135 Cong. Rec. S1842-01, 1989 WL 170672.

*Homelessness?* 50 Ohio St.L.J. 1275, 1280 at n.53 (1989), citing J. Greene & G. Blake, "*A Study of How Restrictive Rental Practices Affect Families with Children*, 3 (1980) (prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development (1980)). "The U.S. Conference of Mayors recently estimated that families with children now constitute more than 30 percent of the homeless population nationwide, with some American cities reporting figures closer to 50 percent." *Bilott, supra* at 1280-81.

While states were slow to address the problem, Rhode Island was among the first to prohibit discrimination on the basis of familial status. *Id.* at 1281, citing only fourteen (14) states, including Rhode Island, which by 1988 "had proscribed to any extent discrimination against families with children in rental housing based on familial status."[9] The Rhode Island Fair Housing Practices Act ("FHPA") declares that "the practice of discrimination in rental housing based on the potential or actual tenancy of a person with a minor child" undermines public policy, because it "subverts" the fundamental principles upon which Rhode Island and the United States were established. R.I.G.L. § 34-37-1(c). The existence of discrimination based on familial status has detrimental consequences for Rhode Island communities, including "condemn[ing] large groups of inhabitants to dwell in segregated districts or under depressed living conditions in crowded, unsanitary, substandard, and unhealthful accommodations;" contributing to intergroup tension; compromising the public health, safety, and general welfare; and creating substantial burdens on the public revenues for the relief of these undesirable effects. *Id.*

---

[9] The same article noted, however, that major loopholes exist, such as the exemption of "adult-only communities." Bilott, *supra* at 1277. The Rhode Island statute currently provides an exemption for senior housing. R.I.G.L. §34-37-4.1(a)(4) and (5).

It is with this backdrop, of clear, established federal and state social policy, expressed by the United States Congress and the Rhode Island General Assembly, that the Court reviews the Commission's claims.[10]

## II.

### Exhaustion

The Defendants first posit a procedural barrier to the Court's consideration of the merits of the Commission's discrimination claims.[11] They argue that the administrative process leading up to the filing of the Complaint was flawed and did not constitute exhaustion of administrative remedies. (ECF No. 57-4). Exhaustion was allegedly deficient in two respects: (a) that the Commission did not give sufficient notice of the reliance on discriminatory *impact* (as compared to discriminatory *treatment*) and (b) that the Commission's efforts at conciliation were inadequate for a similar reason – because the Defendants were not put on adequate notice of the theory of discriminatory *impact*.

---

[10] In assessing claims of discrimination pursuant to state statutes, Rhode Island has historically borrowed much from its federal counterparts. *Newport Shipyard v. R.I. Commission for Human Rights,* 484 A.2d 893, 897-98 (R.I. 1984) (applying *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 793 (1973)] framework to state employment discrimination case). This is particularly appropriate where "the Rhode Island Fair Housing Practices Act mirrors the core provisions of its federal analog, …" *Cumberland v. Woerner*, 2012 R.I.Super.LEXIS 120, at *63-64 (August 1, 2012). Although Rhode Island has not explicitly addressed a disparate impact theory of liability under the FHPA, both the fact that it has followed federal law in its substantive assessment of discrimination claims and that it has expressly recognized disparate impact liability in non-housing discrimination contexts militate toward a conclusion that Rhode Island would follow *Inclusive Communities, supra,* in holding that disparate impact proves discrimination under the FHPA. *See Casey v. Town of Portsmouth*, 861 A.2d 1032, 1036 (R.I. 2004) (recognizing disparate impact as well as disparate treatment in federal employment discrimination cases and explicitly adopting federal interpretations in construing Rhode Island Fair Employment Practices Act and RICRA claims).

[11] The Defendants initially also contended that a claim of disparate impact could not be maintained "in the absence of a finding of intent to discriminate." *Inclusive Communities, supra,* decided after the filing of the initial cross-motions, has settled that question in the Commission's favor.

The exhaustion requirement serves to give a potential defendant "prompt notice of the claim and to create an opportunity for early conciliation." *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir. 1996) (employment discrimination). That notice then serves to limit the scope of any subsequent complaint to "the charge filed ... and the investigation which can reasonably be expected to grow out of that charge." *Id.*

The claim under the FHA and FHPA is that of discrimination in housing. Although disparate treatment and disparate impact are theories of liability, they are not independent causes of action. The Court must look at the substance of the charge, focusing "on the factual allegations made ..., describing the discriminatory conduct about which a plaintiff is grieving." *Williams v. New York City Housing Auth.,* 458 F.3d 67, 70 (2d Cir. 2006), quoted in *Rivera-Andreu v. Pall Life Sciences PR, LLC*, No. 14-1029, 2014 WL 5488409 at *3 (D.P.R. October 29, 2014).

The gist of a discriminatory impact claim, as discussed more fully below, is that a facially neutral policy was implemented in a way that adversely and disproportionately impacted a protected group. There is no question that the Defendants were on notice that the Grimeses were a family with children and therefore members of a protected class, that the catalyst for their being denied housing was the addition of a child to their family, that the reason they were denied housing was because of a policy applied to them rather than because of anything unique (or "offensive") about them or their conduct, and that the policy – which was Defendants' own – was facially neutral. Ironically, while the Defendants' memorandum claims insufficient notice because, *inter alia,* the charge "make[s] no reference to ... a facially neutral policy," their defense at the pre-determination conference was specifically that they were enforcing "a neutral occupancy policy." (ECF No. 56-4 at ¶4). While the statistical evidence of disparate treatment

of families with children as opposed to households without was neither proffered nor mentioned at the administrative level, that goes more to awareness of the proposed proof of the claim, and is not essential to notice of the nature of the claim.[12] *Pacheco v. Mineta,* 448 F.3d 783, 792 (5th Cir. 2006) (plaintiff need not allege a prima facie case before the agency in order to exhaust).

The charge filed by the Commission in this case clearly described the offending action as an alleged breach of the lease "due to an excess in the number of occupants for a one-bedroom unit." (ECF No. 56-10 at ¶7).[13] An occupancy policy is a facially neutral practice or policy. *See Zawacki v. Realogy Corp.,* 628 F.Supp.2d 274, 281 (D.Conn. 2009) (court must look at actual facts alleged to determine whether notice adequate). The Grimeses did not allege specific actions on the part of the Defendants demonstrating a purposeful intention to keep children out of the complex. Nor did they allege that there was anything unique about them that prompted enforcement of the occupancy policy. Nor did they point to anything about their *particular* family status, other than the number of persons, that prompted the Defendants' actions. Indeed, the same policy had been cited when the tester was told that her "pretend" family of two adults and a newborn would not be permitted under the occupancy policy to occupy a one-bedroom apartment. (ECF No. 17-2 at ¶11).

---

[12] One would think it would be commonsense to imagine that households of three and above are more likely to be households of families with children than households of only adults, at least in a residential housing area not populated by college students.

[13] *Rivera-Andreu, supra* is instructive, even though the court found the disparate impact theory insufficiently identified by the plaintiff at the administrative level. There, while the plaintiff identified a specific policy of wage adjustment that was responsible for his claimed adverse treatment, all of his allegations were that he, as the oldest employee by many years, was treated uniquely in being denied a wage increase. *See* allegations at *4. Almost by definition, the claim sounded in purposeful discriminatory treatment. *Rivera-Andreu* is also instructive in its reminder that claims framed by *pro se* plaintiffs, as Mardea Caulcrick-Grimes was at the time (ECF No. 63-4), should be "liberally construed in order to afford the complainant the benefit of any reasonable doubt." *Id.* at *4.

The judicial complaint need not mirror the complaint filed with the administrative agency. "[T]he scope of the civil complaint is … limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." *Lattimore v. Polaroid Corp., supra* at 464 (employment discrimination). Claims may be asserted in a lawsuit "if they are reasonably related to those that were filed with the agency." *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir. 2003), quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir. 2001) (claimant's description of national origin sufficient to provide notice of race discrimination). "[I]t is the substance of the charge and not its label that controls." *Alonzo v. Chase Manhattan Bank, N.A.,* 25 F.Supp.2d 455, 458 (S.D.N.Y. 1998). The claimant's charge need not be specific or plead a prima facie case. *Pacheco v. Mineta, supra.*

At the pre-determination Conference held in this case on May 24, 2012 the occupancy policy, as a *policy*, was explicitly discussed. (ECF No. 63-4 at ¶15-16). The fact that the policy was uniformly enforced was specifically discussed. *Id.* at ¶13. The words "disparate impact" may well never have been spoken aloud, as the Defendants allege (ECF No. 56-4 at 2), but they need not have been.[14]

The Court finds that the theory of disparate impact was sufficiently exhausted, because the core elements of the claim were known or apparent, because the disparate impact claim was "reasonably related" to the charge, and because the disparate impact claim was well within the scope of an investigation of the charge.

---

[14] The first mention of the phrase "disparate impact" may have been in the comments section of the probable cause finding on May 24, 2012. The comments read, "The [unclear] application of Warwick building code for occupancy does not take into account the space used by an infant and thus their standard has disparate impact on families with small children." (ECF No. 63-6 at 5). According to the Affidavit of Angela Lovegrove, who was at the pre-determination conference, the report with those comments was available to the Defendants' attorney in a file he had the right to access, but he did not do so. (ECF No. 63-4 at ¶¶18-19, 23).

In a related contention, the Defendants argue that they were functionally denied the opportunity to conciliate by the lack of specificity pointing to disparate impact. The notice of opportunity to conciliate was sent on May 24, 2012, and referred to the finding of probable cause (which did specifically mention "disparate impact"). *See* n. 13, *infra*. In any event, the Defendants' allegation that "perhaps the matter would have resolved" had they been more aware of the "disparate impact" nature of the claim is, frankly, implausible. The Defendants showed little interest in conciliation and have failed to articulate why the difference in theories affected their willingness to conciliate.

*Mach Mining, LLC v. EEOC*, ___ U.S. ___, 135 S.Ct. 1645 (2015), a very recent United State Supreme Court opinion reviewing conciliation efforts by the EEOC in an employment discrimination context, does not provide a basis for rejecting the Commission's claim. First, the decision relies heavily on the specific conciliation language of Title VII: "the Commission 'shall endeavor to eliminate [an] unlawful employment practice by informal methods of conference, conciliation, and persuasion.' … That language is mandatory, not precatory." *Id.* at 1651 (internal citations omitted). The language related to conciliation in the FHA is very different: "[HUD] shall, to the extent feasible, engage in conciliation with respect to such complaint." 42 U.S.C.A. § 3610(b)(1). Thus, there is flexibility by clear statutory language and in this respect, the obligation is different from that of the EEOC's under Title VII.

Second, the conciliation obligation, even were it identical to that under Title VII, is to "tell the employer about the claim – essentially, what practice has harmed which person or class – and [] provide the employer with an opportunity to discuss the matter in an effort to achieve voluntary compliance." *Id.* at 1652. The Commission did that, advising the Defendants that a review of its two person per bedroom occupancy policy, applied to the Grimeses' disadvantage,

constituted discrimination and it offered an opportunity to discuss the matter at a conciliation conference. (ECF No. 56-11). There is nothing in *Mach Mining* suggesting the agency is required to pursue a party not apparently interested in a conciliation discussion or browbeat it into negotiating. Indeed, to the contrary, *Mach Mining* makes clear that the affording of an opportunity is sufficient.[15]

Thus, the Court finds there is no procedural bar to consideration of the motions for summary judgment on their merits.

## III.

## **Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure governs the summary judgment process. It provides,

**Rule 56. Summary Judgment**

(a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT.
A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

By the terms of Rule 56, a party is entitled to summary judgment only if both conditions specified in Rule 56 are met: that "no genuine dispute [exists] as to any material fact" and that the undisputed facts demonstrate that the party is "entitled to judgment as a matter of law." *See, Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987) (undisputed material facts, together with

---

[15] Moreover, it is crystal clear that if there is an attempt at conciliation, the "kind and extent of discussions" are solely within the discretion of the agency, not subject to judicial scrutiny. *Id.* at 1656. *Mach Mining* cautions that the scope of a Court's review of an agency's conciliation efforts is "narrow." *Id.* at 1649.

inferences drawn against the movant, "must lead to one reasonable conclusion in favor of the movant" to justify summary judgment). A material fact is one that "might affect the outcome of the suit under the governing law. … Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Summary judgment deprives the parties of the opportunity to have a jury determine the outcome. But it serves to weed out those cases that do not warrant a trial because there are no facts in dispute to be decided by a jury: "[The summary judgment] rule acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise." *Conward v. Cambridge School Committee,* 171 F.3d 12, 18 (1st Cir. 1999), quoted in *Napier v. Town of Windham,* 187 F.3d 177, 184 (1st Cir. 1999). Thus, the law requires that all reasonable inferences be drawn against the moving party and that summary judgment be granted if the undisputed facts and inferences that flow from them allow of only one reasonable conclusion in favor of the movant. *Knight, supra,* citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, [251] (1986).

There is no genuine dispute in this case as to any material fact. All agree that the Grimes family lived at Briarwood Meadows, that the addition of a baby caused Briarwood to enforce an occupancy policy that precluded three people sleeping in the bedroom of that apartment, that the bedroom measured just over 150 square feet, that Briarwood asserted and relied upon a need for 170 square feet of bedroom space, and that the State Building Code has been the governing occupancy regulation since before these events occurred. The Commission has introduced evidence of the policy's discriminatory impact on families with children, and the Defendants, while relying on an expert opinion going to the legitimacy of their business interests, have not countered the statistical evidence of discriminatory impact and, indeed, for the purposes of

summary judgment "do not contest that their occupancy policy would disproportionately affect families with children." (ECF No. 57 at p. 4).

The Court finds that there are no disputed factual issues on which a decision on the merits turns.

## IV.

### Analysis

A near-comprehensive web of civil rights protections against discrimination has been woven by Congress in the forty-one years since President Lyndon Johnson signed the Civil Rights Act of 1964.  Primarily through that sweeping legislation and its siblings in subsequent years, discrimination on the basis of characteristics from age to race, gender to disability, is prohibited in such varied contexts as housing, education, employment and public accommodations.[16]

Along with a commonality of theme, these statutory causes of action share a similarity in the legal construct employed to enforce the rights protected.  With discrete exceptions, discrimination is actionable whether it is intentional (discriminatory treatment) or the unintended consequence of a facially neutral policy (discriminatory impact).[17]  Disparate treatment occurs

---

[16] There is no single template. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, prohibits discrimination in employment "because of" race, color, religion, sex, or national origin; Title IX of the Civil Rights Act of 1964, 20 U.S.C. §§ 1681(a), 1684, prohibits discrimination in education "on the basis of" sex and "on the ground of" blindness or severely impaired vision; the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623, prohibits discrimination in employment "because of" age; the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. § 12112, prohibits discrimination "on the basis of" disability.

[17] *Griggs v. Duke Power Co.,* 401 U.S. 424, 432-33 (1971) (Title VII) (both methods of proof available); *Smith v. City of Jackson,* 544 U.S. 228, 235 (2005) (ADEA) (both methods available); *E.E.O.C. v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 601 (1st Cir. 1995) (disparate impact under the ADA). *But see Hardie v. National Collegiate Athletic Association,* No. 3:13-

where members of a group sharing race, sex, ethnicity, or other protected characterizations have been intentionally denied employment by the employer, because of those specific attributes. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988).  In contrast, disparate impact cases are the result of policies or practices that are not necessarily intended to discriminate but in fact have a disproportionately adverse effect on a protected class.  *Watson v. Fort Worth Bank & Trust, supra* at 987 ("the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination").[18]  "[T]he disparate impact approach roots out 'employment policies that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *E.E.O.C. v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 601 (1st Cir. 1995) (employment discrimination), quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15 (1977).

> In contrast to a disparate-treatment case, where a "plaintiff must establish that the defendant had a discriminatory intent or motive," a plaintiff bringing a disparate-impact claim challenges practices that have a "disproportionately adverse effect on minorities" and are otherwise unjustified by a legitimate rationale.

*Inclusive Communities, supra* at 2513, citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

---

cv-0346-GPC-DHB, 2015 WL 1511006 at *3 (S.D.Cal., March 24, 2015) (discussing conflicting decisions on the availability of disparate impact to prove liability under Title II).

[18] The Defendants have conceded, as they must, that discriminatory impact is cognizable under the FHA. (ECF No. 72 at p. 2, discussing *Inclusive Communities, supra).*  There is not always a clear line between theories of liability.  In an early FHA familial status case, for example, the court combined what it apparently saw as an obviously disparate impact on families with children of a one person per bedroom rule -- even in the absence of any statistical evidence -- with the apartment complex's statements discouraging tenants with children to find a prima facie case. *United States v. Badgett, dba Georgetown Apartments,* 976 F.2d 1176, 1179 (8th Cir. 1992).

The parallelism of theories of liability is no coincidence: In finding discriminatory impact cognizable under the FHA, the Court borrowed heavily from its previous analyses of the related provisions of both Title VII and the ADEA. *See gen'ly, Inclusive Communities* at 2519 ("A comparison to the antidiscrimination statutes examined in *Griggs* and *Smih* is useful.").

The parallelism extends to the analytic framework. The construct for reliance on disparate impact is somewhat different from that described as the structure for proving intentional discrimination in a disparate treatment case, but it shares fundamental logic. To show disparate treatment, a plaintiff must first demonstrate a *prima facie* case of (a) membership in a protected group (e.g., race, gender), (b) an adverse action (e.g., failure to be hired), (c) eligibility for favorable treatment (i.e., qualified for a job), and (d) that others not members of the protected group received favorable treatment (*e.g.,* were hired). *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  In a housing discriminatory treatment case, that showing would be made by (a) proof of membership in a protected group, (b) eligibility for housing, (c) denial of housing, and (d) the conferring of the benefit to someone outside the protected class. *E.g., Alexander v. Riga,* 208 F.3d 419, 430 (3d Cir. 2000), *cert. den. Riga v. Alexander,* 531 U.S. 1069 (2001) (landlord told African-American renter there was no apartment available while maintaining to white testers that there was a vacancy).

In a disparate impact case of alleged housing discrimination, a prima facie case is shown by proof that the plaintiff has suffered an injury because a facially neutral policy deprives members of a protected group in disproportionate numbers of a benefit available to non-members of the group.  The elements roughly corresponding to those in a disparate treatment case are (a) membership in a protected group; (b) a denial of a housing benefit; (c) the causal relationship between the denial and a facially neutral policy (i.e., the disparate impact); and (d) that the

benefit remained available or was given to a non-member of the group. *Alexander v. Riga, supra.*[19]  In the decision that announced the availability of disparate impact liability under the FHA, the Supreme Court cautioned about the importance of demonstrating causality as part of the prima facie case:   "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Communities, supra* at p. 2523.

In every discrimination analysis, the ascendancy of the first step of the prima facie case by the plaintiff causes a shift of the burden of production to the defendant to justify the inference of discrimination that the prima facie case has raised.[20]  In a disparate impact action under the FHA, the defendant's response is sufficient if it shows "the valid interest served by their policies." *Id.* at  2522 ("valid interest" is "analogous to the business necessity standard under Title VII").   The First Circuit has described the burden as the need to "justif[y with] a legitimate

---

[19] HUD itself has described the burden shifting test for determining whether a given practice has an unjustified discriminatory effect leading to liability under the Act.  24 CFR §100.500.  The burden on the plaintiff is to show that the policy has "a discriminatory effect [because] it actually or predictably results in a disparate impact on a group of persons ... because of ... familial status."  24 CFR §100.500(a).  The burden then shifts to the defendant to present a "legally sufficient justification" that demonstrates that "the challenged practice (i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the defendant, and (ii) Those interest could not be served by another practice that has a less discriminatory effect."  24 CFR §100.500(b)(ii)(2).

[20] For example, in an employment discrimination action, the defendant must respond to the prima facie case with evidence of a legitimate, non-discriminatory reason for its action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The defendant is not required to prove that the nondiscriminatory reason was the actual basis for the decision not to hire the plaintiff, but rather "it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Id.*  "To be sure, the Title VII framework may not transfer exactly to the fair-housing context, but the comparison suffices for present purposes."  *Inclusive Communities, supra* at 2523.

and substantial goal of the measure in question." *Langlois v. Abington Housing Authority,* 207 F.3rd 43, 51 (1st Cir. 2000).

### Prima Facie Case

The Grimeses are clearly a family.  With the birth of Janjay, the family fell within the embrace of the FHA and the FHPA "familial status" protection because it contained a member under the age of eighteen (18) living with a parent or guardian.  Equally clearly, the Grimeses were denied continued occupancy of their one-bedroom apartment because of the family status conveyed by JanJay's birth.  *United States v. Badgett*, 976 F.2d 1176,  1179 (8th Cir. 1992) (refusal to rent one-bedroom apartment to woman with child because of "one bedroom/one person" rule, even if facially neutral, violates the Act where there is a disparate impact on protected class).

Disparate impact is proven by presentation of evidence "compar[ing] those affected by the policy with those unaffected by the policy."  *Gashi v. Grubb & Ellis Property Management Services, Inc.,* 801 F.Supp.2d 12, 16 (D.Conn. 2011).   Whether the context is employment or housing discrimination, a wide enough contrast between the way a policy burdens members of a protected group as opposed to non-members  is cognizable as a disparate impact.  *See* cases collected *infra* at p. 21.

In *Gashi,* the plaintiff relied on census data, interpreted by an expert witness, to show that 30.76% of households with children would be adversely affected by the one bedroom/two persons occupancy limit, while only 9.88% of households without children would be so affected.  *Id.* at 16-17.  In the instant case, the Commission submitted a report of its expert, Dr. Calvin P.

Bradford.  In this case as in *Gashi, supra*,[21] Dr. Bradford used census data to compare the impact of the Briarwood policy on "households with children that is compared to households without children when controlling for household size."  (ECF Nos. 52-3, 52-7).  Drilling down, he limited the households counted specifically to rental households, calculating the "sub-population of household size that is subject to the occupancy policy at issue" in each group (households with children and households without).  (ECF Nos. 52-3, 52-4).  He further refined the calculation by limiting the inquiry by income range of families likeliest to be renting apartments at the Briarwood level (between $900 to $1,400 per month).  *Id.*  His data came from the entire state, as he reasoned that because the complex is a large one, "roughly in the center of the State of Rhode Island," and close to major highways, the rental market would be statewide.  (ECF No. 52 at p. 6).[22]  *Compare*, *Gashi, supra* (city-wide statistics from Stamford, CT.) with *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (nationwide statistics regarding physical height and weight characteristics could be relied upon because there was "no reason to suppose" that data for the Alabama population would differ markedly).

Using methodology explained in his report, Dr. Bradford found that the Briarwood policy impacted families with children in a statistically significant and disproportionate way.[23]  He

---

[21] According to his CV, Dr. Bradford testified in the *Gashi* case, as well as in many others.  (ECF No. 45).

[22] Noreen Graul testified in deposition that residents at Briarwood in fact came from "all over." (ECF No. 46 at p. 2).

[23] In earlier disparate impact cases, recourse has been had to what was termed the "Four Fifths Rule" or "80 Percent Rule."  *Langlois v. Abington Housing Authority*, *supra* at 50 (four-fifths formula, approved as "pertinent benchmark in the employment context," as "triggered where the selection rate for any race is less than four fifths the rate for the group with the highest selection rate").  Dr. Bradford's report explains that this measure, "[because it is] often used in employment cases," looks at "the percentages of populations that receive *favorable* treatment" – i.e., the percentage of applicants who are accepted.  (ECF No. 52 at p. 5).

found a disparity ratio of 4.55 for 3-person households with children, a ratio of 14.25 for 4-person households, and a ratio of 6.92 for 5-person households.  "Therefore, the pattern of statistically significant disparities due to familial status is robust and the magnitude of the disparities is extremely large, even when we control for this rent range."  (ECF No. 53 at p. 13).

When controlled by income range, the disparity ratio for 3-person households was 3.19 – still well above the 1.25 that, he said, separates the statistically significant from the insignificant.  *Id.*

Based on all the statistics he examined, he concluded that even "[a]t the lowest disparity ratio (for 3-person households that pay rents between $900 and $1,400), households with children are

---

> For example, assume that 70% of the white applicants (the control group) would be accepted under a practice but that only 30% of the minority applicants (the protected class) would be accepted under the practice.  By the Four-Fifths Rule, if the proportion of minority applicants who would be accepted is less than four-fifths (0.8 or 80%) of the proportion of whites who would be accepted, then, the disparity would be considered to be significant in a substantive sense.

*Id.*  But because evaluation of occupancy policies compares groups *adversely* affected rather than receiving an advantage, Dr. Bradford used instead "the disparity ratio."  His report explained the relationship between the Four Fifths Rule and the disparity ratio in the following way:  the Four Fifths Rule would divide the percentage of households *without* children that were disadvantaged by the Briarwood policy by the percentage of households *with* children that were disadvantaged.  In contrast, a disparity ratio inverts the equation by dividing the percentage of households *with* children by the percentage without.  (ECF No. 52 at p. 6).  The former – applied to a with-children percentage of 12.5% and a without-children percentage of 8% -- would yield a ratio of .64 (less than four fifths and therefore statistically significant).  The disparity ratio applied to the same percentages would be 1.56.  "Based on this application of the inverse of the Four-Fifths Rule, any disparity ratio greater than 1.25 would be defined as having a substantive disparate impact."  *Id.*

The plaintiff's burden does not require any particular methodology, so long as the statistics show that "the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof."  *Fudge v. City of Providence Fire Department*, 766 F.2d 650, 658 (1st Cir. 1985).  *Accord, Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly*, 658 F.3d 375, 382 (3rd Cir. 2011), partially quoting *Hallmark Developers, Inc. v. Fulton Cnty*, 466 F.3d 1276, 1286 (11th Cir. 2006) ('[N]o single test controls in measuring disparate impact,' but the Residents must offer proof of disproportionate impact, measured in a plausible way").

more than three times as likely to be adversely impacted by the rule when compared to comparable households with no children." (ECF No. 53 at p. 16).

An impact such as this is sufficient to establish a prima facie case of disparate impact discrimination against families with children. *See, e.g., N.A.A.C.P. v. North Hudson Regional Fire & Rescue*, 665 F.3d 464, 479 (3rd Cir. 2011) (0.62% of firefighters hired were African-American, compared to African-American population of 3.4%); *Keith v. Volpe,* 858 F.2d 467, 484 (9th Cir. 1988) (impact of development policy "had twice the adverse impact on minorities as it had on whites [, which] established a racially discriminatory effect"); *Huntington Branch N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 929 (2nd Cir. 1988) (a showing that impact of shortage of affordable rental housing was "three times greater on blacks than on the overall population," was sufficient for prima facie case); *Gashi v. Grubb Property Management Services, supra* (30.76% of households with children adversely affected by the one bedroom/two persons occupancy limit, while only 9.88% of households without children so affected).

### Legitimate Business Interest

Once a plaintiff has demonstrated a prima facie case, the defendant must come forward with a justification of "a legitimate and substantial goal of the measure in question, …"[24] *Langlois v. Abington Housing Authority, supra* at 51. If a policy "is necessary to achieve a valid interest[,]"

---

[24] A defendant may, of course, also contest at the first level by challenging the prima facie case – "attacking the plaintiff's proof head-on, debunking its sufficiency or attempting to rebut it …, asserting, say, that no identifiable policy exists, or that the policy's implementation produces no disparate impact, or that the plaintiff's empirical claims – such as the claim of causation – are insupportable." *E.E.O.C. v. Steamship Clerks Union, Local 1066, supra* at 602.

it may survive even though it has a disproportionate impact on a protected group. *Inclusive Communities, supra* at 2523.[25]

In this case, the Defendants offer several purported business justifications, none of which hold water sufficiently to overcome the discriminatory impact. Most squarely, the Defendants contend that they relied on the opinion of the then-Warwick Building Inspector that the applicable building code required a minimum of 170 sq. ft. for this family of three to occupy a 1-bedroom apartment. They put forth that reliance in a two-pronged thrust. First, they assert that they relied directly on the opinion of former Director of Administration of the Warwick Building Department Fred B. Sarno that 170 sq. ft. was required under state law.[26] Second, in a similar

---

[25] The Supreme Court also cautioned on the importance of requiring the plaintiff to demonstrate causation between the challenged policy and the adverse impact. *Inclusive Communities, supra* at 2512 ("A robust causality requirement ensures that '[r]acial imbalance … does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create.") (ellipse original). In this case, that causal relationship is evident.

[26] Mr. Sarno is proffered as an expert witness. He authored the report submitted by the Defendants in support of their motion for summary judgment. (ECF No. 56-2). The Commission moved to strike Mr. Sarno's report pursuant to Fed.R.Evid. 104(a) and 702. (ECF No. 33). The Court grants the motion. Mr. Sarno's report addresses three distinct subjects. First, it contains some assertions regarding measurement of the apartment that are really issues of historical fact, not matters for expertise. Second, it proffers an expert opinion that because Warwick interprets the State Code as requiring 170 feet (70+50+50), use of the bedroom by three people would constitute an unlawful change in the use of the structure in the eyes of Warwick. Third, it proffers an expert opinion that using a non-bedroom area of the apartment as a sleeping area for one person would violate various Code provisions because of the lack of smoke detectors, sufficiently large windows, and the like.

As to the first, there is no dispute that the measurement of the Grimes' bedroom is more than 150 square feet. Mr. Sarno's report asserts the overage is only a fraction of an inch but a fraction of an inch in this circumstance is as good as a mile. *Cf,* Seuss, *Horton Hears a Who* (Random House, 1954) ("A person's a person, no matter how small").

As to the second, this is simply a back-door method of promoting Warwick's misinterpretation of the State Code as justification for the occupancy policy. As such, it is irrelevant, for the reasons expressed at pp. 24-25, *infra,* and the Motion to Strike (ECF No. 33) this portion of the report is granted.

but subtlety different formulation, they assert that because of that opinion, they needed to enforce 170 sq. ft. in order to comply with the way City of Warwick would have enforced state law.

The problem with this reliance is that Mr. Sarno's opinion was simply wrong as a matter of fact and law and not only was it unequivocally wrong, it was not even a plausible interpretation of applicable law. Because of that, Briarwood's policy of precluding a third person in the Grimes' bedroom in order to comply with that misinterpretation cannot be said to be "necessary to achieve a valid interest." *Inclusive Communities, supra* at 2515. Nor can it meet the slightly different formulation of *Langlois* that the policy be "justified by a legitimate and substantial goal, ..." *Langlois, supra* at 51.

The language of § 404.4.1 of the new housing and maintenance code of the Rhode Island State Building Code, R.I.G.L. § 23-27.3-100.1, in effect from 2010 forward and the only controlling Code, is unambiguous with regard to square footage required for occupancy in a bedroom. Section 404.4.1 provides:

> Every bedroom occupied by one person shall contain at least 70 square feet (6.5 m$^2$) of floor area, and every bedroom occupied by more than one person shall contain at least 50 square feet (4.6 m$^2$) of floor area for each occupant thereof.

(ECF 49, Affidavit of Rhode Island Building Commissioner John P. Leyden). This section is crystal clear. The first portion of the sentence governs space requirement when one person

---

With respect to the third – that no other sleeping area is acceptable – this is a topic upon which Mr. Sarno seems qualified and application of the various fire code provisions to a particular space is an appropriate topic for expert testimony. In the words of Rule 702, his status as a certified building inspector and experience as the Director of Administration of the Warwick Housing Department renders him an expert by virtue of his "knowledge, skill, experience, training, or education" and compliance with fire safety regulations is a topic upon which his knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." However, as the Court's Opinion holds that the Grimes family as it was constituted was, in its entirety, entitled to sleep in the bedroom, the issue of an alternative sleeping area is moot, and the Motion to Strike (ECF No. 33) is granted with respect to this topic *pro forma*.

occupies a bedroom: at least 70 square feet. The second portion of the sentence governs square footage required when more than one person occupies a single bedroom: at least 50 square feet per person, i.e. at least 150 square feet for three persons. It cannot be read any other way.[27]

In any event, the critical issue here is that the calculation resulting in a purported minimum of 170 square feet required is simply wrong, however it was reached. This is not analogous to qualified immunity where defendants are shielded from the effects of wrongful action if they subjectively and reasonably believed in the lawfulness of their conduct. If this were a purposeful discrimination case, the Defendants' ability to point to a non-discrimination motivation for enforcement of the policy might be relevant to negate intent. But intent to discriminate is not required in a disparate impact action. *Langlois v. Abington Housing Authority, supra* at 49. Here, regardless of the culpability or lack thereof of the Defendants in putting forth a misinterpretation of the controlling Code, regardless of whether the Defendants came to that misinterpretation on their own or in reliance on the opinion of a third party,[28] it

---

[27] Mr. Sarno's opinion that 170 square feet was required could reflect any number of mistakes. He may simply have misread or not understood it: he testified in deposition that he believed the Code required 70 square feet for the first person plus 50 square feet for each additional occupant. There is no amount of re-reading of the language that could support that conclusion. Alternatively, Mr. Sarno may have compressed the *Warwick* Building Code (which, as the controlling Code until 1970, required 70 square feet for the first person plus 40 square feet for each additional occupant) with the State Code, and plugged in the "50" square feet from the State Code for the "40" in the City Code. Or, he may have applied the superceded Rhode Island Housing Maintenance and Occupancy Code, R.I.G.L. § 45-24.3-1 (rep), which would have calculated 70+50+50 but exempted children under one year old. The parties disagree on whether municipal Codes such as the Warwick Building Code remained an alternative until 2010, but there is neither disagreement nor any question that as of 2010, the State Building Code was the *sole* building code regulating occupancy limits.

[28] The Defendants make much of the fact that Paul Driscoll, president of the corporation owning Briarwood, specifically consulted the Warwick Building Office when the State Code became controlling in 2010 to make sure Briarwood was in compliance. He was (wrongly) informed that the State Code required 170 square feet of bedroom for 3 persons. (ECF No. 56-1 at ¶7-8). Were this an enforcement action by the Warwick Building Authority, it might conceivably be estopped by its wrong advice. *See Heckler v. Community Health Services of Crawford County,*

simply is a wrong statement of law and a policy that is designed to effectuate it does not serve a legitimate business purpose.

This case is similar to *Gashi v. Grubb & Ellis Property Management Services, Inc., supra.* There, the plaintiffs ran afoul of a "2 person per bedroom" rule when their son was born. The apartment complex pointed to the NFPA Life Safety Code as justification for the policy. Without evidence that the NFPA Code was binding on the town, the Court held, it could not serve as a legitimate interest justifying the policy. *Id.* at 18. Here too, since the Defendants cannot point to a binding Code consistent with their reading, it cannot be sustained as a legitimate business interest.

The Defendants articulate in their memorandum no other legitimate business interest served by the policy that holds water. There is an intimation in the depositions that the infrastructure at Briarwood could not sustain occupancy at rates consistent with the State Building Code, but the Defendants have failed to submit evidence supporting that speculation.[29]

---

*Inc.,* 467 U.S. 51, 60 (1984) (leaving open the question of whether and under what circumstances, if ever, the government can be equitably estopped). But the innocence of Briarwood's reliance is irrelevant here.

[29] In an affidavit, Briarwood President Paul Driscoll opined that increasing occupancy would result in too much noise, excessive wear and tear, and the like. Similarly, Noreen Graul's affidavit alleges that "allowing all 552 units to exceed occupancy limits would have a profound effect on life in the complex. It would increase wear and tear on the common areas, increase noise, and negatively affect parking. It would increase demand for common area amenities, such as the pool and fitness center, and increase the cost of utilities." (ECF No. 9-1 at ¶20). Presumably, not all 552 units include families with children (or are even already occupied by two persons), and there is no showing of what the actual impact would be if one child were added in each one-bedroom apartment. In addition, while the Defendants allege increased demand on facilities, there is no demonstration that the increase would tax the facilities, exceed their capacity, or otherwise be infeasible. *Compare, Mountainside Mobile Estates Partnership v. HUD,* 56 F.3d 1243, 1255 (10th Cir. 1995) (in challenge to mobile park's occupancy limitation of no more than 3 persons per unit, defendant produced evidence of why the park's sewer system could not accommodate modern single-wide or double-wide homes housing more people in each and the structural survey that the occupancy policy was based on); *United States v. Weiss,* 847

Documentation of "structural limitations or systems limitations" is required in order to rely on them as a legitimate concern. *Gashi, supra* at 18.

The Defendants explain that the occupancy limitations were, at least in some measure, a reaction to the tragic Station Nightclub fire in 2003 that claimed the lives of 100 Rhode Islanders. http://en.wikipedia.org/wiki/The_Station_nightclub_fire. There is, however, no nexus between that concern and the Defendants' occupancy policy. Presumptively, at least, compliance with the State Building Code – which would allow the Grimes family in the 150 sq. ft. bedroom – satisfies the legitimate concerns and sensitivity about over-crowding of which the Station Nightclub fire reminds us.

Finally, the Defendants point to what is termed "The Keating Memorandum," issued by the United States Department of Housing and Urban Development (HUD) on March 20, 1991.[30] The Keating Memo attempted to clarify an earlier, internal memorandum intended to guide HUD's protocol for evaluating claimed violations of the FHA. The earlier memorandum, issued in February 1991, had set out a rebuttal presumption that occupancy limitations of two persons in each bedroom "as a general rule, is reasonable under the Fair Housing Act." The subsequent publication in March was impelled by the "significant misunderstanding of the Department's

---

F.Supp. 819, 823 (D.Nev. 1994) (in challenge to occupancy limitation, defendants produced engineering report on capacity of the hot water systems and the cost of retrofitting the entire piping system to accommodate additional occupants). In her deposition testimony, Ms. Graul was unable to describe how allowing the Grimes child to occupy the bedroom would increase wear and tear, or demand for parking, or demand for amenities or the use of common facilities. With respect to noise, she opined that "children cry and run and can be disruptive." (ECF No. 46 at p. 69). There is not in this record any supporting evidence whatsoever for the defendants' bald allegations that adhering to the state occupancy Code would tax the Briarwood complex facilities.

[30] According to the affidavit of Paul Driscoll, president of the corporation that owns Briarwood, the Defendants relied on both the Keating Memo and the Sarno misinterpretation of the Building Code. (ECF No. 56-1 at ¶4, 8).

position on the question of occupancy policies which would be reasonable under the Fair Housing Act." (ECF No. 56-3). The clarifying memorandum stressed that the original publication was intended solely to present internal guidance to HUD's regional counsel to evaluate claims of FHA violations, presumably for enforcement purposes. It was never intended to "establish an occupancy policy which [HUD] would consider reasonable in any fair housing case, ..." but simply to set out a rebuttal presumption for purposes of HUD's evaluations and enforcement. *Id.* at p. 3-4.

The Keating memorandum on its face does not provide a justification for an occupancy policy that disparately impacts families with children. Nor does the spirit of the memorandum, which sought to provide guidelines for the expenditure of HUD resources for enforcement, do so. Iglesias, *Revitalizing Application of the Federal Fair Housing Act to Private Residential Occupancy Standards,* 28 Ga.St.U.L.Rev. 619, 641-42 (Spring 2012) ("legal status of the Keating Memo has always only been as HUD's internal enforcement guideline, and never as a liability rule"). Thus, neither the Keating Memorandum itself, nor the Defendants' claimed motivation of trying to "comply" with the Keating Memorandum serves as a legitimate business interest justifying the occupancy policy at issue.[31]

### Third Step

The Defendants' burden of production is simply to come forward with "*evidence* (whether persuasive or not) of nondiscriminatory reasons, ..." *St. Mary's Honor Center v. Hicks,* 509

---

[31] The Keating memorandum might provide support if the applicable Code indeed required 170 square feet. The memorandum refers to a host of factors to determine whether a particular policy is "reasonable," including governing state or local law. "If a dwelling is governed by ... governmental occupancy requirements, and the housing provider's occupancy policies reflect those requirements, HUD would consider the governmental requirements as a special circumstance tending to indicate that the housing provider's occupancy policies are reasonable." (ECF No. 56-3 at p. 6). Here, however, the providers occupancy policies do not "reflect [the] requirements" of the governing Code.

U.S. 502, 509 (1993).  The proffered reason need not be taken at face value.  *E.E.O.C. v.*
*Costello,* 850 F.Supp. 74, 77 (D.Mass. 1994) (family tradition of membership in union was not a
"rationale for the policy" but, instead, simply an explanation of "the motives of those who have
had its advantage").

The analytic framework of *McDonnell Douglas*, however, is not one into which every case
fits neatly, and the scenario here presents a less-than pristinely plain next step.     Does a finding
that none of the proffered reasons pass muster as valid business interests – either as a matter of
law as in the case of the misinterpreted State Code or because of a failure of any supporting
evidence as in the case of structural deficiencies – mean that the defendants have failed in their
burden of production?  *See Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1039 (2nd Cir.
1979) (where cooperative apartment building corporation put forth black purchaser applicant's
vulgar language and abrasiveness as reasons for rejecting his application, but there were only
rumors of this conduct and no evidence it was actually relied on, the defendants had failed in
their burden of production).  Or does it mean that they have met that burden but that the plaintiff
has succeeded in showing that those reasons are pretextual or otherwise not legitimate?  *See*
*Keith v. Volpe,* 858 F.2d 467, 484 (9th Cir. 1988) (proffered justifications for refusal to issue
permit for new construction – prevention of school overcrowding, traffic, and desire to disperse
low-income tenants – were pretexts for racial discrimination).

Both paths lead to the same destination.

The Court has no reason to doubt that the Defendants believed they were carrying out the
State Building Code.  That belief was simply not reasonable and no stretch of imagination or
statutory language could make it so.  The Court also has no reason to doubt that the Defendants
did not intend to discriminate against families *per se*.  Presumably, the Defendants would have

accepted a one-parent and one-child family into that one-bedroom apartment, and would have rejected a group of three unrelated persons.  Indeed, the Court accepts the assertion made by Noreen Graul that Briarwood "[does] not care if the two people are parent and child, two adults of the same sex, or a conventional couple." (ECF No. 9-1 at ¶12).

Nonetheless, the policy that was applied against the Grimes family had the clear impact of discriminating on the basis of familial status and it is not justified by any evidence of a legitimate rationale put forth by the Defendants.  Thus, it constitutes unlawful discrimination under the federal Fair Housing Act and the state Fair Housing Practices Act.

V.

**Relief**

The Fair Housing Act provides for the award of damages, both compensatory and punitive, to a prevailing plaintiff.[32]  42 U.S.C. § 3613 (c)(1).  Compensatory damages can include those for emotional distress. *Steele v. Title Realty Co.,* 478 F.2d 380, 384 (10th Cir. 1973), cited in *F.A.A. v. Cooper,* ___ U.S. ___, 132 S.Ct. 1441, 1449 (2012).  Punitive damages (of up to $1,000) may be awarded in the absence of a compensatory damage award, *Alexander v. Riga,* 208 F.3d 419, 430 (3rd Cir. 2000), *cert. den. Riga v. Alexander,* 531 U.S. 1069 (2001), and even in the absence of actual damages a plaintiff is entitled to a nominal award. *Id.* at 429, citing *Carey v. Piphus,* 435 U.S. 247, 266-67 (1978).

---

[32] Both an individual plaintiff and an organization litigating on behalf of an individual may be awarded damages.  Beyond compensating individual plaintiffs, damages may be awarded under the FHA for losses suffered by an organization bringing an action to vindicate the interests of a private person, such as the Commission for Human Rights in this case.  Such an organization can be compensated for the diversion of its resources to investigate and prosecute the action, as well as for outreach and education it may do subsequent to the action to educate the public and landlords about the culpable conduct. *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), *cert. den. Combs v. Fair Housing of Marin*, 537 U.S. 1018 (2002) (litigation damages of $14,217 for diversion of resources and $10,160 for frustration of mission supported standing).

In this case, the Commission, the three Grimeses, and the plaintiff tester all seek damages, as well as reasonable counsel fees.  The Motion for Partial Summary Judgment extended to liability only.  Damages still need to be proven, and the Court will hold a separate hearing on those issues on appropriate motion.

## VI.

### Conclusion

The Plaintiff's Motion for Partial Summary Judgment with respect to liability (ECF No. 40) is GRANTED, and the Defendants' Motion for Summary Judgment (ECF No. 56) is DENIED.

IT IS SO ORDERED:

_____

John J. McConnell, Jr.
United States District Judge

Date: 8/13/15

30